UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| MAC ROLLINS BELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5:18-CV-32-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| CHRISTINA BELL JEFFERSON, as | ) | **ORDER** |
| Executrix of the Estate of Carol S. Bell, | ) | |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

This matter is before the Court on the Motion for Summary Judgment by Defendant

Christina Bell Jefferson, as Executrix of the Estate of Carol S. Bell, in which Defendant

challenges the timeliness of Plaintiffs' claims, [R. 50]. Plaintiffs Mac Rollins Bell and Richard

McMurtry Bell filed a Response, [R. 51], and Defendant filed a Reply, [R. 52]. Also before the

Court is Defendant's Second Motion for Summary Judgment, filed after the close of discovery

and concerning the merits of Plaintiffs' claims, [R. 61]. Plaintiffs also filed a response to that

motion, [R. 72], and Defendant filed a reply, [R. 79]. For the reasons set forth below, the Court

will deny Defendant's first Motion for Summary Judgment, [R. 50], and deny in part and grant in

part Defendant's Second Motion for Summary Judgment, [R. 61].

## I. BACKGROUND

Many of the facts central to this motion are undisputed. Carol S. "Macky" Bell's mother,

Kathryn Staton, and uncle, Richard McMurtry, owned seven tracts of land in Harrison County,

Kentucky (hereinafter, "the Family Farm"). In Richard's will, he devised a life estate in his

portion of the Family Farm to Kathryn, his sister. Richard's will provided that, upon Kathryn's

death, Macky Bell would hold a life estate in the Family Farm, with her sons, Plaintiffs Mac

- 1 -

Rollins Bell ("Mac Bell") and Richard McMurtry Bell ("Rick Bell"), holding a remainder interest. Kathryn's will similarly devised her interest in the Family Farm to Macky Bell for life, with the remainder to Mac and Rick Bell.

Richard died in 1980, at which point Kathryn possessed a life estate interest in Richard's portion of the Family Farm. Several years later, on July 3, 1997, Kathryn executed a contract for the auction of the Family Farm. [R. 50-2] The auction occurred on December 4, 1997, and sale contracts were executed for the seven tracts of land comprising the Family Farm on December 6, 1997. [R. 50-8] Shortly thereafter, Kathryn passed away. At this point, by virtue of the wills of Kathryn and Richard, Macky Bell held a life estate interest in the entirety of the Family Farm, and Mac and Rick Bell held remainder interests. [R. 38, p. 68]

Pursuant to the sale contracts, deeds of sale were executed and signed by Macky Bell and her husband, on January 12, 1998; Rick Bell and his wife on January 13, 1998; and Mac Bell on January 16, 1998. Later that month, the closings occurred. [R. 50-4]

The sale of the Family Farm netted proceeds of roughly $730,000. Plaintiffs claim, and Defendant agrees, that the proceeds were deposited directly into an Edward Jones account, No. 58304242 (hereinafter, "the Farm Account"). *See* [R. 51, p. 2]; [R. 50, p. 3]. It is undisputed that the approximately $730,000 deposited into the Farm Account represented the cash proceeds from the sale of Macky Bell's life estate and Plaintiffs' remainder interests in the Family Farm. The Farm Account was titled solely in Macky Bell's name, but the account bore the subtitle "Carol S. Bell Attn U/W of Kathryn M. Staton & Richard M. McMurtry." *See, e.g.*, [R. 50-5; R. 50-6]. Similarly, the addressee listed on the account was "Carol S. Bell Attn U/W of Kathryn M. Staton & Richard M. McMurtry." [R. 38, p. 49] On some Edward Jones documents, it was also informally labeled as "Bell, Macky – Farm." *See, e.g.*, [R. 61-6; R. 61-8].

Macky Bell and her husband (now deceased) also opened other accounts with Edward Jones around this time, including an account for their personal funds. [R. 38, p. 35] Though Macky Bell lived in North Carolina, her Edward Jones accounts, including the Farm Account, were managed by an Edward Jones branch located in Cynthiana, Kentucky. *Id.* at 26. After her husband died (and prior to the appointment of any powers of attorney), Macky Bell solely directed all transactions related to the accounts, including the Farm Account, through her financial advisor, Mark Trachsel, who worked at the Edward Jones Cynthiana branch. *See generally, id.* at 26–41.

Rick Bell testified that he and Mac Bell "firmly believed" that the funds in the Farm Account were their assets. [R. 38, pp. 79–80] A 1099-S form shows that Rick Bell claimed $260,609.00, or approximately one-third of the sale proceeds, as gross income on his 1998 taxes. [R. 72-1]. Rick also testified that he believed he and Mac Bell were the beneficiaries of the Farm Account and were listed as powers of attorney on the account at the time it was created in 1998. *Id.* at 83–84. This assumption was based on his own recollection and conversations with the financial advisor, but he admitted that he might have been mistaken. *Id.* at 90–91. There is no evidence that either son was listed as a beneficiary or attorney-in-fact at that time.

By no later than August 11, 2005, the parties executed a Power of Attorney Agreement. [R. 61-6] A few days later, the parties executed a Power of Attorney Affidavit & Indemnification Form for Edward Jones—specifically, for the Farm Account. [R. 61-7] In it, Macky Bell confirmed that Mac and Rick Bell were authorized "to give Edward Jones instructions regarding my account, including the authority to buy, sell, exchange, assign and otherwise trade securities in my account." *Id.* Macky Bell, Mac Bell, and Rick Bell each signed the Affidavit and Indemnification Form. *Id.* Later, on February 18, 2011, Macky Bell executed a Transfer on

- 3 -

Death Form, in which she designated Mac and Rick Bell as the beneficiaries of the Farm Account upon her death. [R. 61-8]

Throughout this time, from approximately January 1998 through November 2016, the Farm Account grew steadily. Macky regularly withdrew some funds from the account, but the bulk of the account remained intact. Her financial advisor, Trachsel, testified that funds from the Farm Account were regularly transferred to Macky Bell's bank account or her other Edward Jones account. [R. 38, pp. 54–55] He testified that the regularly transferred funds represented the "earnings," or interest, from the Farm Account, which was used for Macky Bell's expenses or savings. *Id.* at 55, 57. He explained that most of the income from the investment account was transferred to Macky Bell's personal accounts over the years, but the Farm Account grew in other ways. *Id.* at 57. By 2016, the Farm Account held over one million dollars. *Id.*

Though the Farm Account grew steadily from 1998 to 2016, there is no evidence that Mac or Rick Bell made any demand for payment from the account during that time. *Id.* at 84. Rick Bell testified that he never made any demand to have the account changed in any way. *Id.* at 84. However, after being granted powers of attorney, the two sons were active in the management of the account, frequently speaking with Trachsel, the financial advisor. *Id.* at 32. Trachsel testified that he worked with Mac and Rick Bell only in their capacities as attorneys-in-fact, and he could not recall talking with them on an issue without also talking to Macky Bell. *Id.*

Sometime in 2016, Macky Bell and her two sons had a falling out. On November 1, 2016, Macky revoked the 2005 Power of Attorney Agreement and completed a new agreement listing Christina Bell Jefferson (Rick Bell's daughter and Mac Bell's niece) as her power of attorney. [R. 61-9] She also contacted Trachsel and directed him to move her Edward Jones accounts, including the Farm Account, to an Edward Jones branch in North Carolina. [R. 38, pp. 40, 98]

Shortly thereafter, on January 13, 2017, Macky Bell revoked the February 2011 Transfer of Death Form designating Mac and Rick Bell as the beneficiaries of her account. [R. 61-10] As a result of these actions, Mac and Rick Bell could no longer access the Farm Account. Edward Jones statements from this time period indicate that the account funds decreased dramatically, from approximately $1,045,730.77 in February 2017, [R. 72-9], to approximately $626,201.57 in March 2017, [R. 72-10].  In July 2017, Mac and Rick Bell requested an accounting of the funds in the Farm Account, but their request was denied. [R. 2-4]

Soon after, on August 31, 2017, Mac and Rick Bell filed suit against Macky Bell[1] in Harrison Circuit Court, asserting claims of conversion (Count I), breach of fiduciary duty in connection with a joint venture (Count II), and breach of fiduciary duty in connection with a constructive trust (Count III). [R. 1-1] On January 5, 2018, Macky removed the case to this Court, invoking the Court's diversity jurisdiction. [R. 1] That same day, Macky filed a Motion to Dismiss, arguing lack of personal jurisdiction. [R. 2] On September 3, 2018, before the Court ruled on the Motion to Dismiss, Macky Bell passed away. [R. 9] Christina Bell Jefferson, Executrix of the Estate of Carol S. Bell, was eventually substituted as a defendant, in lieu of the original defendant, Macky Bell. [R. 23] On July 10, 2019, the Court conducted an evidentiary hearing on the Motion to Dismiss. [R. 31] It later issued a Memorandum Opinion and Order denying the motion. [R. 32]

On June 10, 2020, Defendant filed her first Motion for Summary Judgment, arguing that each of Plaintiffs' claims must be dismissed as untimely. [R. 50] On this point, the parties agree to the applicable statutes of limitations: two years for a conversion claim under KRS § 413.125;

---

[1] Plaintiffs also named Christina Bell Jefferson as a defendant. However, after Christina, acting as executrix of Macky's estate, was substituted as a defendant, the plaintiffs voluntarily dismissed their claims against Christina in her individual capacity. [R. 28] She remains in this lawsuit solely as the executrix of Macky's estate.

five years for a breach of fiduciary duty under KRS § 413.120(6); and five years for a constructive trust under KRS § 413.120(11). [R. 51, p. 3] However, the parties disagree about *when* each cause of action accrued. Defendant argues that each of these causes of action accrued in 1998, when the sale proceeds were transferred into Macky Bell's Edward Jones account. In response, Plaintiffs argue that their causes of action accrued no earlier than 2016, when Macky Bell removed them as powers of attorney, thereby restricting their access to the account, and took other actions hostile to their interests in the Farm Account.

The Court, having reviewed these arguments, ordered the parties to supplement their briefing and address the following: the fiduciary relationship that exists between a life estate holder and remaindermen; the general rule that the statute of limitations does not run against remaindermen until the death of the life estate holder; and the possibility of repudiation by a life estate holder or abandonment by remaindermen. [R. 80] The parties have now filed their supplemental briefs, [R. 83; R. 84], and the matter is ripe for review.

Meanwhile, discovery concluded, and Defendant filed her Second Motion for Summary Judgment on November 25, 2020, [R. 61]. In that motion, Defendant argues that (1) Plaintiffs' conversion claim must fail because they admitted that they consented to Macky Bell's possession and enjoyment of the sale proceeds and they abandoned their interest in the same; (2) the breach of fiduciary duty (joint venture) claim must fail because the only evidence in support of that claim is Plaintiffs' own self-serving testimony, and further, a joint venture agreement must satisfy the Statute of Frauds; and (3) a claim for a constructive trust must fail because it is an equitable remedy, but there is nothing to remedy if Counts I and II fail. This Second Motion for Summary Judgment is also fully briefed and ripe for review. [R. 72, R. 79]

**II.  STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. That moving party may satisfy that burden by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case. *Celotex Corp.*, 477 U.S. at 323. Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

## III.  ANALYSIS

### A.  FIRST MOTION FOR SUMMARY JUDGMENT, [R. 50]

As noted above, the parties agree that the conversion claim is subject to a two-year statute of limitations, and the breach of fiduciary duty (joint venture) and breach of fiduciary duty (constructive trust) claims are each subject to five-year statutes of limitations. However, the parties disagree about *when* each cause of action accrued.

In their Complaint, Mac and Rick Bell allege that, with their consent, "[t]he proceeds representing both the life estate and the remainder were invested jointly in the name of [Macky Bell]," that they had the right to possess the sale proceeds immediately at the time of sale, and that in 2016–2017, Macky Bell exercised dominion and control over the sale proceeds for her own benefit, thereby intentionally denying her sons the use, enjoyment, and benefit of their property. [R. 1-1, ¶¶ 9, 17–21]. Rick Bell later clarified that he believed the conversion occurred when Macky Bell limited her sons' access to the Farm Account. [R. 38, pp. 79–80] The plaintiffs next allege that they entered into a joint venture with Macky Bell, by express or implied agreement, and Macky Bell violated her fiduciary duties to Mac and Rick Bell by "prevent[ing] Plaintiffs from receiving the benefits of the joint venture" and "by failing to provide an accounting of funds." *Id.* ¶¶ 26–28, 32. Lastly, with respect to their constructive trust claim, the plaintiffs allege that "at the time of the sale of the [Family Farm] the life estate interest of [Macky Bell] was terminated" and "the full value of the remainder of the estate was vested in the Plaintiffs through the cash proceeds of the sale." *Id.* ¶¶ 37–38. They allege that, upon the joint investment of those funds, a constructive trust was created, thereby triggering certain fiduciary duties. *Id.* ¶ 40. They allege that Macky Bell violated her fiduciary duties by refusing to provide an accounting and refusing to make the funds available to her sons. *Id.* ¶¶ 44–45. Rick Bell testified that he believed the constructive trust was created in 2016, when the Farm Account was transferred to a North Carolina Edward Jones branch. [R. 38, pp. 81–82]

In this Motion for Summary Judgment, Defendant argues that all three causes of action listed in the Complaint accrued in 1998, at the time the Family Farm sale proceeds were deposited into an Edward Jones investment account held solely in Macky Bell's name. [R. 50] In making these arguments, Defendant relies heavily on the allegations in the Complaint—e.g., that Mac and Rick Bell "had the right to possess their portion of the sale proceeds immediately at the time of sale of the underlying property and at any time thereafter," [R. 1-1, ¶ 17], and that Macky Bell has "exercised dominion and control over the property" for her own benefit, thereby denying Mac and Rick Bell "the use, enjoyment, and benefit of" the sale proceeds, *id.* at ¶¶ 18–20. Based on these allegations, Defendant argues that a claim for conversion necessarily accrued in 1998, when Macky Bell first "exercised dominion and control" over the sale proceeds by depositing them into the Farm Account.[2] [R. 50, pp. 6–9] "From that wrong," Defendant argues, "Plaintiffs derive the claimed existence of a joint enterprise and that the Defendant" violated certain fiduciary duties, and that the cause of action therefore accrued in 1998.[3] *Id.* at 10. Defendant also points to the Complaint's allegation that "at the time of the sale of the property the full value of the remainder estate vested in the Plaintiffs through the cash proceeds of the sale" and a constructive trust was created "at the time of the vesting of the proceeds" in 1998.[4] [R. 1-1, ¶¶ 38, 40]

---

[2] The intentional tort of conversion "is generally defined as 'the wrongful exercise of dominion and control over the property of another.'" *Jasper v. Blair*, 492 S.W.3d 579, 582 (Ky. App. 2016) (quoting *Jones v. Marquis Terminal, Inc.*, 454 S.W.3d 849, 853 (Ky. App. 2014)).

[3] A joint venture creates a fiduciary relationship among the parties. *See Jones v. Nickell*, 179 S.W.2d 195, 196 (Ky. 1994); *Lappas v. Barker*, 375 S.W.2d 248, 251 (Ky. App. 1963). Accordingly, partners in a joint venture must act with "good faith or honesty, loyalty or obedience, as well as candor, due care, and fair dealing." *Lach v. Man O'War, LLC*, 256 S.W.3d 563 (Ky. 2008) (quoting *Anthony v. Padmar, Inc.*, 465 S.E.2d 745, 752 (S.C. App. 1995)) (internal quotation marks omitted).

[4] A constructive trust is an equitable remedy imposed by a court "in respect of property which has been acquired by fraud, or where, through acquired originally without fraud, it is against equity that it should be retained by him who holds it." *Bewley v. Heady*, 610 S.W.3d 352, 357–58 (Ky. App. 2020). Such "constructive trusts may be imposed as a remedy associated with claims of fraud, breach of confidence, breach of fiduciary duty, or unjust enrichment." *Id.*

In response, Mac and Rick Bell argue that they "left their property, their shares of the fund from the sale of the Farm property, in their mother's care," [R. 72, p. 7], and their mother unlawfully exercised control over their portion of the sale proceeds no earlier than 2016, when she transferred her Edward Jones account to a North Carolina branch and restricted her sons' ability to access the account. [R. 51, p. 4] Accordingly, they argue, the conversion and breach of fiduciary duty (joint venture) claims arose in 2016 at the earliest. *Id.* at 4–5. With respect to their constructive trust claim, they argue that the sale proceeds were not wrongfully appropriated or disposed of until 2016, at the earliest, because they agreed to the joint investment with their mother until she took steps to deprive them of their funds; therefore, a constructive trust could have been imposed no earlier than 2016. *Id.* at 6–7. In the alternative, they argue that the doctrine of laches should toll the statute of limitations in this case. *Id.* at 7–8.

In her reply brief, Defendant again argues that these causes of action accrued in 1998 when Macky Bell deposited the sale proceeds into an investment account titled solely in her name. Defendant also argues that the breach of fiduciary duty (joint venture) claim fails because an oral agreement for a long-term join venture must satisfy the Statute of Frauds[5] and such a claim is otherwise untimely.

As noted above, the parties also supplemented their briefs at the Court's request. In Defendant's supplemental brief, she again relies on the Complaint's allegations that the life

---

at 358. The statute of limitations begins to run at the time the trust is created—or in other words, at the time of the fraud or inequitable conduct—so long as such facts were known to the interested persons at that time. *Patton v. Coldiron*, 281 S.W. 812, 813 (Ky. 1926); *see also* 55 A.L.R.2d 220 (1957).

[5] With respect to this first Motion for Summary Judgment, the Court addresses only Defendant's statute of limitations arguments. It does not address the Statute of Frauds argument raised for the first time in Defendant's reply brief, [R. 54], as Defendant makes this same argument in her Second Motion for Summary Judgment, [R. 61], filed after the close of discovery. The plaintiffs have responded to the Second Motion for Summary Judgment, and the Statute of Frauds argument has been fully briefed in that response and Defendant's reply. [R. 72; R. 79] The Court will address the Second Motion for Summary Judgment below.

estate terminated in 1998, with Mac and Rick Bell each owning fee simple title to their share of the sale proceeds. [R. 83] However, in their supplemental brief, Mac and Rick Bell alternatively contend that the life estate arrangement was not terminated, and they therefore continued to hold a remainder interest in the sale proceeds. [R. 84]

In addressing these arguments, the Court is mindful of the standard for a motion for summary judgment, explained in detail above. At this stage in the proceedings, the Court must determine whether the record, taken as a whole, could lead the trier of fact to find for the nonmoving party, in which case there exists a genuine issue of material fact and summary judgment is inappropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted). Stated another way, the Court must consider the evidence of record and is not bound by the factual allegations recited in the Complaint, as Defendant suggests. *See Smith v. Pan Am World Airways*, 706 F.2d 771, 773 (6th Cir. 1983) ("The purpose of summary judgment is to pierce the pleadings and to assess the proof to determine if there is a genuine need for a trial." (citing *Bryant v. Commonwealth of Kentucky*, 490 F.2d 1273, 1275 (6th Cir. 1974))); *Granger v. Marek*, 583 F.2d 781, 786 (6th Cir. 1978) (same). With these principles in mind, the Court considers the parties' arguments.

### 1. A reasonable jury could conclude that the life estate and remainder interests were not terminated in 1998, and the interests continued in the sale proceeds.

As an initial matter, the Court must consider what interests Macky Bell, Mac Bell, and Rick Bell held in the Family Farm sale proceeds. There is no dispute that, prior to the sale, Macky Bell possessed a life estate in the property, and Mac and Rick Bell held remainder interests, by virtue of the wills of Kathryn Staton and Richard McMurtry. The question then becomes, what happened to these interests when the parties sold the Family Farm in 1998?

As a general rule, "in the case of a sale of the entire property, the tenant for life and the remaindermen take the same interests in the proceeds, respectively, as they had in the property, the income going to the life tenant and the principal at his death to the remaindermen." *Holman v. Holman*, 77 P.2d 515, 520 (Cal. Ct. App. 1938) (quoting 17 R.C.L. p. 646, § 38) (internal quotation marks omitted); *see also* 31 C.J.S. § 64. As the Supreme Court of Kentucky has explained,

> where there has been a voluntary sale of property owned by a life tenant and remaindermen without agreement as to the disposition of the proceeds, the same shall be regarded as a substitution and the respective rights continue therein as had existed in the property sold, that is to say, the life tenant will continue to have only the right to the income and use of the converted estate until it is terminated by his death, when the rights of the remaindermen become complete and absolute.

*Miracle v. Miracle*, 86 S.W.2d 536, 539 (Ky. 1935).

The life estate holder and the remaindermen may, however, enter into an agreement to terminate their interests in the sale proceeds. *See Holman*, 77 P.2d at 520; *Miracle*, 86 S.W.2d at 539 (suggesting that estates may be terminated upon a voluntary sale of the estate property and an agreement between the parties); 31 C.J.S. Estates § 73. For example, in *Holman*, the California state court explained that, upon the joint execution of a deed of sale by the life estate holder and the remaindermen, the parties' respective estates in that property necessarily terminated, and the purchaser took fee simple title to the property. *Holman*, 77 P.2d at 520. Under the general rule, the life estate interest and the remainder interests would continue in the sale proceeds. However, the life estate holder and remaindermen could have "divided the proceeds of the sale between them or they might have made some agreement regarding a future division of the proceeds *whereby they would have indicated an intention that the respective estates which had existed in the real property should not continue in the proceeds*." *Id.* (citation omitted) (emphasis added). In *Holman*, however, there was no evidence to support this theory.

- 12 -

*Id.* One of the parties asserted that there existed an agreement respecting the division of the sale proceeds, but it was ultimately determined that no such agreement existed. *Id.* In the absence of such an agreement, the Court found that the general rule applied, and the life estate and remainder interests continued in the sale proceeds. *Id.*

The fact that the life tenant and remainderman had jointly executed a deed of sale did not alter the *Holman* court's analysis, nor did the fact that the sale proceeds were turned over to the life tenant and held by her with the consent of the remainderman. *Id.* The court explained that this was "not indicative of an abandonment of [the remainderman's] right to share in such proceeds in the absence of an agreement to that effect." *Id.* Rather, "[i]t was entirely reasonable that when the land was sold the proceeds of the sale should be held and retained by the life tenant who had the undoubted right to use any part or all of such proceeds for her proper maintenance during her life." *Id.* at 521.

In the present case, Macky Bell, Mac Bell, and Rick Bell jointly executed deeds of sale conveying the Family Farm to the purchasers in 1998. In their initial pleadings, Mac and Rick Bell contend that they were entitled to take their portion of the sale proceeds at that time. [R. 1-1, ¶ 17] In other words, Mac and Rick Bell initially believed that their remainder interests (and Macky Bell's life estate interest) were terminated at the time of sale, with each party taking a fee simple title to his or her respective share of the proceeds. *Id.* ¶¶ 37–38. However, in their supplemental brief, [R. 84], Rick and Mac Bell argue that the life estate arrangement continued.[6]

---

[6] To the extent Defendant argues a lack of notice concerning Plaintiffs' alternative theory that the life estate arrangement continued, the Court provided each side an opportunity to provide supplemental briefing addressing the facts and law relative to this alternative theory.

As the above-cited law demonstrates, Macky Bell, as the life estate holder, and Mac and Rick Bell, as the remaindermen, could have entered into an agreement to terminate their respective estates and divide the proceeds amongst themselves, in fee simple. However, in the absence of such an agreement, the life estate and remainder interests continued in the sale proceeds. *Miracle*, 86 S.W.2d at 539. The following facts support the latter theory.

First, Macky Bell deposited the entirety of the sale proceeds into the Edward Jones investment account, which was titled solely in her name. Despite Defendant's argument to the contrary, "the fact that the proceeds of the sale were turned over to the life tenant and retained by her with the consent of the remainderman is not indicative of an abandonment of his right to share in such proceeds in the absence of an agreement to that effect." *Holman*, 25 Cal. App. 2d at 457. Further, Rick Bell testified that he did not direct the funds to be placed in the Edward Jones account, [R. 38, p. 86], suggesting that Macky Bell retained her right to the exclusive use and enjoyment of the property, as a life estate holder. *See Hammons v. Hammons*, 327 S.W.3d 444, 451 (Ky. 2010) (explaining that "a life tenant owns the property during the life estate and is entitled to the full use and enjoyment of the property, including the income and profits" (citations omitted)). The account was informally labeled as the "Bell, Macky – Farm" account, *see, e.g.*, [R. 61-6; R. 61-8], and was more formally titled "Carol S. Bell Attn [under the wills] of Kathryn M. Staton & Richard M. McMurtry." *See, e.g.* [R. 50-5; R. 50-6]. Similarly, the addressee listed on the account was "Carol S. Bell Attn [under the wills] of Kathryn M. Staton & Richard M. McMurtry." [R. 38, p. 49] This suggests that Macky Bell possessed the sale proceeds only as intended by the wills—or in other words, Macky Bell retained the life estate provided to her under the wills, subject to her sons' remainder interests in the entirety of the Farm Account upon her death.

- 14 -

Further, Macky Bell's personal funds were held in a separate Edward Jones account, *id.* at 35, suggesting that she did not consider the sale proceeds to be her personal funds; rather, she was holding the funds as a fiduciary and subject to her sons' remainder interests (just as she would have possessed the Family Farm subject to her sons' remainder interests, had it never been sold). On a regular basis, funds from the Farm Account were deposited into Macky Bell's personal Edward Jones account or her personal bank account. *Id.* at 54–55. These transferred funds represented the interest earned on the Farm Account. *Id.* at 55. The evidence indicates that the interest was used for Macky Bell's expenses and savings, *id.* at 57, in the same manner that a life estate holder is entitled to use the estate. *See Hammons*, 327 S.W.3d at 451 (explaining that "a life tenant is entitled to the full use and enjoyment of the property, including the income and profits" (citations omitted)). Macky Bell never sought tax or investment advice from her accountant regarding a joint enterprise or joint investment of funds. [R. 38, p. 25].

Additionally, Macky Bell's financial advisor, Trachsel, testified that she exercised authority and control over the account, *id.* at 38, which is consistent with a life estate holder's right to possession and control during her lifetime. Trachsel also testified that he worked exclusively with Macky Bell (or her husband, prior to his death) to manage the account. *Id.* at 45. After her sons were listed as powers of attorney, Trachsel would also correspond regularly with Mac and Rick Bell, but he could not recall ever working with the two men without also communicating with Macky Bell. *Id.* at 32. He testified that his client was Macky Bell, not Mac or Rick Bell, and he worked with the men only in their capacities as powers of attorney. *Id.* at 45. Macky Bell eventually listed Mac and Rick Bell as the beneficiaries of the Farm Account, with title to the funds transferring to the two sons immediately upon her death. [R. 61-8] Again, such designation mimics the parties' original interests in the Family Farm—Macky Bell held a life

estate and, at her death, the Family Farm (or now, the proceeds from the sale of the Family Farm) would vest in her sons. There is no evidence that Rick or Mac Bell made any demand for funds from the Farm Account until their mother took actions that they interpreted as being against their interests in the funds.

Based on this evidence, a reasonable jury could conclude that the parties proceeded as though their respective interests in the Family Farm continued in the sale proceeds. Stated another way, the evidence indicates that Macky Bell's actions were consistent with that of a life estate holder, and the sons' actions were consistent with those of remaindermen. From this, a reasonable jury could conclude that there was no express agreement to extinguish the life estate arrangement upon the sale of the Family Farm. In the absence of such an agreement, the parties took the same interests in the sale proceeds as they had in the real property. *See, e.g.*, *Miracle*, 86 S.W.2d at 539. Thus, a reasonable jury could review the evidence of record and conclude that Macky Bell continued to hold a life estate in the sale proceeds from the Family Farm, and Mac and Rick Bell continued to hold remainder interests in those funds.

**2.  If the life estate and remainder interests did not terminate in 1998 and instead continued in the sale proceeds, a cause of action accrued in 2016, at the earliest.**

To determine when a cause of action accrued under these circumstances, the Court must first consider the rights and responsibilities of a life estate holder. The exact scope of a specific life estate is determined by the language used to create that life estate. *See* 31 C.J.S. Estates § 43. Generally speaking, however, "a life tenant owns the property during the life estate and is entitled to the full use and enjoyment of the property, including the income and profits, though she may not consume any part of the corpus," unless the testator so provides. *Hammons*, 327 S.W.3d at 451 (citations omitted). Thus, a life estate holder is entitled to use, control, and enjoy the property in which he or she holds a life estate. *See English v. Carter*, 189 S.W.2d 839, 840

- 16 -

(Ky. 1945) ("Free enjoyment is the very essence of a life estate."); 31 C.J.S. Estates § 43.

However, that right is not unfettered. A life estate holder "must exercise reasonable precaution to

preserve the property intact without injury or diminution." *Miracle v. Miracle*, 86 S.W.2d 536,

538 (Ky. 1935). Stated another way, the life estate holder must not damage the inheritance of the

remaindermen, or in other words, commit waste. *English*, 189 S.W.2d at 840 (quoting

*Brandenburg v. Petroleum Exploration*, 291 S.W. 757, 759 (Ky. 1927)); *see also Hammons*, 327

S.W.3d at 451.

 The Supreme Court of Kentucky considered these rights and responsibilities and

determined that the relationship between a life estate holder and remaindermen is a quasi-trustee

or fiduciary relationship, limited in scope:

> A life tenant has sometimes been referred to as a trustee, quasi-trustee, or fiduciary
> in relation to the remainderman, but only in the sense that, like trustees, life tenants
> have a duty not to injure or dispose of the corpus of the estate to the detriment of
> the remainderman. *Miracle v. Miracle*, 86 S.W.2d 536, 538 (Ky. 1935); *Superior
> Oil Corp. v. Alcorn*, 47 S.W.2d 973, 987–88 (Ky. 1931). However, unlike the
> trustee of a pure trust, a life tenant may use the property for her exclusive benefit,
> taking the income and profits. *Id.*

*Hammons*, 327 S.W.3d at 451–52; *see also Potter v. Conn. Mut. Life Ins. Co.*, 361 S.W.2d 515,

516 (Ky. 1962) ("Though [life estate holder] may not have been a 'trustee' in the strict sense of

trusts, nevertheless her relation to [the remaindermen] was fiduciary in character."); *Wheeler v.

Kazee*, 253 S.W.2d 378, 380 (Ky. 1952) ("It has been held that the relationship between a life

tenant and a remainderman is of a fiduciary nature." (citations omitted)); 31 C.J.S. Estates § 40

("The life tenant is a trustee for the remainderman's benefit only in the sense that a duty rests on

her to have due regard for the rights of those in remainder," and therefore the life tenant "cannot

injure or dispose of the property in a manner that impairs the rights of the remainderman, and must

use reasonable precautions to preserve the property intact without injury or diminution.").

- 17 -

Thus, a life estate holder may not injure or dispose of the corpus of the estate. If the life estate holder does so, the remaindermen may bring an action for waste under Kentucky law. *See* KRS § 381.350 (action for waste); KRS § 381.560 (remaindermen may bring action for waste). In Kentucky, remaindermen have also brought claims of breach of fiduciary duty against life estate holders who allegedly failed to protect the remaindermen's interests. *Guess v. Fox*, No. 2012–CA–000517–MR, 2013 WL 3357615 (Ky. App. July 5, 2013); *Hall v. Hall*, No. 2002-CA-000413-MR, 2003 WL 21360890 (Ky. App. June 13, 2003). Similar breach-of-fiduciary-duty claims have been brought against life estate tenants in other states. *See Sexton v. Marine Bank of Springfield*, 617 N.E.2d 869, 871 (Ill. App. Ct. 1993) (finding no breach of fiduciary duty where life estate holder acted within her rights as life estate tenant); *In re Gramm's Estate*, 218 A.2d 342, 347 (Pa. 1966) ("By operation of law, this life tenant-widow occupied the status of a fiduciary with respect to the property bequeathed; her diversion of such property to a purpose other than that provided by the testator's will was a breach of her fiduciary duties, a breach which the courts must not overlook.").

Absent evidence that the life estate holder has injured the corpus of the estate or otherwise acted in derogation of the remaindermen's interests, the remaindermen generally have no cause of action to pursue until the death of the life estate holder. *See, e.g.*, *Brittenum v. Cunningham*, 220 S.W.2d 100, 102 (Ky. 1949) (citing 33 Am. Jur., Life Estates, Remainders, Etc. § 187); 31 C.J.S. Estates § 118. In fact, it is presumed that the life estate holder's possession of the estate is *not* adverse to the remaindermen's interests. *See Wheeler*, 253 S.W.2d at 380 (quoting 31 C.J.S. Estates § 66); 31 C.J.S. Estates § 78. This principle is based "in the rule that, during the existence of the life estate, the remainderman or reversioner has no right to possession and consequently cannot bring an action to recover it." *Wheeler*, 253 S.W.2d at 380 (quoting 31 C.J.S. Estates § 66).

- 18 -

Upon the death of the life estate holder, the remaindermen's interests vest, and they may bring a suit for possession. *See, e.g.*, 31 C.J.S. Estates § 118.

The remaindermen's right to seek immediate possession of the estate may be accelerated, however, if the life estate holder repudiates the life estate and claims some other interest or title (such as a fee simple title) in the property. *Superior Oil Corp., v. Alcorn*, 47 S.W.2d 973, 986 (Ky. 1930). If the life estate holder does so, "the maturity of the remainder is accelerated, and the remainderman becomes just as fully entitled to the immediate possession as if the life tenant has died." *Id.* To repudiate the life estate and accelerate the remainder interest, there must be "an unequivocal act by the life tenant as would destroy his claim as a life tenant, so that he could not thereafter assert it." *Id.*; *see also Wheeler*, 253 S.W.2d at 380 (finding the life estate continued and there was no repudiation where life tenant had not "unequivocally notified" the remainderman that she was claiming a fee simple title in the property in derogation of his interests as remainderman); 31 C.J.S. Estates § 79 ("[T]he possession of one holding a life estate does not become adverse to the holder of the future estate unless the life estate is renounced, and notice is clearly conveyed to the remaindermen that their property is being held or claimed adversely and not under the life tenancy.").

Stated another way, the life estate holder cannot destroy the remaindermen's interest without unequivocally notifying the remaindermen of his or her intention to do so. In the absence of a such clear repudiation (or an agreement among the parties), the life estate holder cannot acquire paramount title against the remaindermen, even if that is the life estate holder's secret intention. *See Wheeler*, 253 S.W.2d at 380 (explaining that a life estate holder could not extinguish the rights of the remainderman simply by purchasing the property at a foreclosure sale, and because she had taken no other action to unequivocally notify the remainderman that

- 19 -

she was claiming a fee simple title in the property purchased at a foreclosure in her name only, the statute of limitations did not begin to run until her death).

In the present case, a reasonable jury could consider the evidence of record and conclude that Macky Bell possessed and used the sale proceeds consistent with a life estate interest in the Family Farm, without incident, at least until 2016. The evidence demonstrates that Macky Bell possessed the sale proceeds, used the interest from the funds for expenses and savings, and left the corpus of the estate intact for the remaindermen. These actions are consistent with the actions of a life estate holder. There is no evidence that she took any actions adverse to the remaindermen's interests until at least 2016, nor is there any evidence that she unequivocally notified them of an intention to claim a fee simple title in the property prior until 2016. The facts that Defendant keeps pounding as evidence of Macky Bell's intention to hold adversely to Plaintiffs' interests (i.e., that she placed the sale proceeds in an account titled solely in her name and referred to it as "my" account) are consistent with her status as a life estate holder, but more importantly, those facts are insufficient under the law to constitute an unequivocal repudiation under the facts of this case. *See, e.g.*, *Wheeler*, 253 S.W.2d at 380.

Then, in November 2016, Macky Bell took certain actions with respect to the Farm Account, including removing Mac and Rick Bell as powers of attorney, thereby restricting their ability to access the account. In early 2017, Macky Bell revoked the Transfer on Death Form that listed Mac and Rick Bell as beneficiaries of the Farm Account. Around this time, she also withdrew significant funds from the account, to the point that it held less than the amount of the sale proceeds back in 1998. In mid-2017, Mac and Rick Bell's request for an accounting was denied. From these facts, a reasonable jury could conclude that Macky Bell unequivocally repudiated the life estate arrangement or otherwise acted adverse to the remaindermen's interest,

thereby breaching her fiduciary duties as the life estate holder. At the earliest, this would have occurred in 2016. Accordingly, Mac and Rick Bell's causes of action would have accrued no earlier than November 2016, and this lawsuit, filed less than one year later, is timely.

One might argue that no cause of action accrued prior to Macky Bell's death because her actions in 2016 did not constitute repudiation or a breach of fiduciary duty. Under Kentucky law, repudiation of a life estate arrangement requires "an unequivocal act by the life tenant as would destroy his claim as a life tenant, so that he could not thereafter assert it." *Superior Oil Corp.*, 47 S.W.2d at 986. In the present case, a reasonable jury could review the evidence of record and conclude that Macky Bell did not unequivocally notify her sons that she was claiming a fee simple interest in the Family Farm sale proceeds. She did transfer her account to a North Carolina Edward Jones branch, but this change did not liquidate any of the account funds or change ownership or title of the account. [R. 38, p. 53]. She revoked the Transfer on Death Form listing the two sons as beneficiaries of the Farm Account, but there is no evidence that she listed any other person as a beneficiary. Thus, one could argue that Macky Bell's actions did not constitute a repudiation of the life estate arrangement or a breach of any fiduciary duty, and therefore, her actions did not trigger any statute of limitations. But even under those circumstances, a cause of action would arise upon Macky Bell's death, in 2018. At that point, Mac and Rick Bell's interest in the Farm Account vested, and they could file suit. *See, e.g.*, 31 C.J.S. Estates § 118; *Boyd v. LaMaster*, 927 F.2d 237, 239 (6th Cir. 1991) (referencing claims for constructive trust and replevin after death of life estate holder). At worst, then, Mac and Rick Bell brought this suit too early.[7]

---

[7] Any cause of action for breach of fiduciary duty based on Macky Bell's status as life estate holder and the plaintiffs' status as remainder beneficiaries will not be time barred until 2022.

In sum, the Court finds that a reasonable jury could review the evidence of record and conclude that the life estate arrangement was not extinguished in 1998 upon the sale of the Family Farm, but rather continued with respect to the proceeds from the sale of the Family Farm that were deposited into the Farm Account. Under these circumstances, the evidence indicates that a cause of action accrued no earlier than 2016. This suit was therefore timely filed.

### 3. A reasonable jury could conclude that the life estate and remainder interests terminated in 1998.

While the record contains evidence upon which a reasonable jury could rely to conclude that the life estate arrangement was *not* terminated by agreement in 1998 (and the life estate and remainder interests therefore continued in the sale proceeds), that evidence is not so strong as to compel a jury to reach that conclusion. In other words, a reasonable jury could review the evidence of record and conclude that the life estate and remainder interests *were* terminated by agreement in 1998. That is, many of the same facts indicating the life estate continued in the Farm Account could also support a finding that the life estate terminated.

Rick Bell testified that he and Mac Bell believed that the sale proceeds (or presumably, their share of the sale proceeds) were their "assets." [R. 38, pp. 79–80]. Rick Bell also reported income in the amount of $260,609.00, or approximately one-third of the sale proceeds, as gross income on his 1998 taxes. [R. 72-1]. If the parties did agree to split the sale proceeds equally, as this evidence suggests, with each owning a one-third share of the sale proceeds, they could rightfully combine the funds and jointly invest them, with Macky Bell managing the funds, or Macky Bell could simply hold the funds for her sons until they requested their distribution of the sale proceeds. *See infra*, Section III(B)(3). Such an arrangement could be inferred from the fact that Macky Bell held the funds in an account titled solely in her name, but labeled as "Carol S. Bell Attn [under the wills] of Kathryn M. Staton & Richard M. McMurtry." Further, Rick and

Mac Bell believed they always had access to the account as powers of attorney and beneficiaries. The only written power of attorney agreement in the record was executed in 2005; however, Rick Bell's testimony clearly indicates that he and Mac Bell believed they were powers of attorney on the account and that the funds were their own assets. This suggests an understanding or agreement that the life estate and remainder interests terminated upon the sale of the property in 1998, with each party taking a fee simple title to their share of the sale proceeds. While this is circumstantial evidence, such evidence is sufficient to survive a motion for summary judgment. *Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 505 (6th Cir. 1996) (explaining that circumstantial or inferential evidence can defeat a motion for summary judgment (citation omitted)).  In other words, a reasonable jury could review this evidence and reasonably infer that there was an agreement to terminate the life estate interests and jointly invest the funds.

### 4. If the life estate and remainder interests terminated in 1998, a cause of action accrued in 2016, at the earliest.

Assuming that the life estate arrangement was extinguished in 1998, Mac and Rick Bell (and Macky Bell) owned fee simple title to their respective shares of the sale proceeds. The proceeds reflecting their remainder interests in the Family Farm were ultimately placed in an Edward Jones account, along with the proceeds from Macky Bell's life estate, and there is no evidence that this occurred without the consent of Mac and Rick Bell. It is undisputed in this scenario that the funds representing the remainder interests of Plaintiffs belonged to them, and they would have been entitled to receive their respective shares of the proceeds of the sale of the Family Farm. Plaintiffs argue that Macky Bell owed certain fiduciary duties to Mac and Rick Bell as a result of them placing their sale proceeds "in their mother's care" to be invested jointly, [R. 72, p. 7], or simply by virtue of her retention of the sale proceeds that constituted their

remainder interests in the Family Farm,[8] and that Macky Bell's actions in 2016 constituted conversion and/or a breach of those fiduciary duties.

### i. Conversion

A conversion claim may be triggered by her wrongful exercise of dominion and control over the property. *Jasper*, 492 S.W.3d at 582 (defining conversion as "the wrongful exercise of dominion and control over the property of another" (quoting *Jones*, 454 S.W.3d at 853)). The two-year statute of limitations would begin to run at the time of the alleged conversion, or in other words, at the time of the alleged tortfeasor's wrongful exercise of dominion and control. *See Yeager v. Bank of Kentucky*, 106 S.W. 806, 807 (Ky. 1908) (quoting *Coffey v. Wilkerson*, 58 Ky 101, 105 (Ky. 1858)) (internal quotation marks omitted).

Defendant argues that the conversion occurred in 1998, when the Family Farm was sold and the proceeds of the sale were deposited in the Farm Account, titled solely in Macky Bell's name. For support, Defendant cites to *Yeager v. Bank of Kentucky*, 106 S.W. 806, 807 (Ky. 1908).[9] In that case, a wife was entitled under her husband's will to the income of his estate (including shares of stock in the Bank of Kentucky) during her life, after which the remainder of his estate would pass to the remaindermen. The mother sold the stock in derogation of the remaindermen's interests. The remaindermen were aware of the sale, but they failed to bring suit within the limitations period. As a result, their conversion claim was untimely.

---

[8] *See infra* Section III(B)(3). Further, in *Holman*, the court ultimately concluded that the life estate and remainder interests in the real property continued in the proceeds from the sale of that property. 77 P.2d at 520. It suggested, however, that if the life estate and remainder interests had been terminated by agreement, the court might consider whether a trust relationship existed between the parties. *Id.*

[9] Defendant also briefly cites to *Nolin Production Credit Association v. Cranmer Deposit Bank*, 726 S.W.2d 693, 703 (Ky. App. 1986) for the proposition that "the retention of the . . . sale proceeds . . . constituted a conversion of those proceeds." [R. 50-1, p. 6 (quoting *Nolin*, 726 S.W.2d at 703) (internal quotation marks omitted)] However, *Nolin* did not involve a life estate arrangement or facts otherwise comparable to the present case. While Defendant has selectively quoted from *Nolin*, she does not offer any explanation as to how *Nolin*'s analysis applies here.

*Yeager* is clearly distinguishable from the present case. In *Yeager*, there was no agreed sale; the life estate holder unilaterally sold the stock, in derogation of her sons' remainder interest. This act constituted a conversion of the estate. The life tenant's sons were aware of the sale against their interests, yet they did nothing. Here, by contrast, the life estate holder (Macky Bell) and the remaindermen (Mac and Rick Bell) all agreed to sell the Family Farm, as evidenced by their joint execution of the deeds of sale. Stated another way, Macky Bell could not possibly have sold the Family Farm in derogation of her sons' remainder interests, because the sons *agreed* to sell the farm, and they also agreed for their sale proceeds to be held and jointly invested by their mother. Accordingly, the *Yeager* case is not supportive of Defendant's argument.

Defendant also relies heavily on the allegation in the Complaint that Mac and Rick Bell "had the right to possess their portion of the sale proceeds *immediately at the time of sale*." [R. 1-1, ¶ 17 (emphasis added)] According to Defendant, this statement "means that the Plaintiffs' claimed right of possession of the Family Farm sale proceeds existed immediately upon [Macky Bell's] receipt of these funds [in 1998]; the cause of action did not accrue when the demand for same was not satisfactorily responded to by Defendant [in 2016/2017]," but rather, it accrued in 1998. [R. 50-1, p. 8]  It seems, then, that Defendant equates the sons' right of possession with the actual conversion. *Id.* at 9 ("Since the conversion of which Plaintiffs complain occurred '*immediately at the time of sale*' in January 1998, the two-year statute of limitations has long since run."). Defendant therefore argues that Plaintiffs allege that the actual conversion occurred "from the outset," and it was therefore not necessary that they make a demand and that Macky Bell refuse their demand to trigger accrual of the claim. *Id.* (citing *Madison Capital Co., LLC v. S&S Salvage, LLC*, 765 F. Supp. 2d 923, 932 (E.D. Ky. 2011)). Thus, "any demand that Rick

and Mac Bell made after their Power of Attorney was revoked and the Farm Account was moved to an Edward Jones investment advisor in North Carolina is wholly irrelevant." *Id.*

But this argument completely ignores the sons' allegation of—and the evidence supporting—an agreement that Macky Bell hold and invest the proceeds for the benefit of the parties. Alleging they have the right to possess the proceeds from the sale of their remainder interests immediately at the time of the sale in 1998 does not mean that Mac and Rick Bell could not otherwise agree that Macky Bell should hold the proceeds and invest them. Plaintiffs allege that the conversion occurred when Macky Bell put them on notice that she was no longer honoring this "agreement" and that she was moving the account and denying them access. Nowhere in the Complaint (or any other filing) do the plaintiffs allege that the conversion occurred at the time of the sale in 1998.

Further, there is no evidence that, prior to 2016, Macky Bell possessed, used, or controlled the sale proceeds without her sons' consent or contrary to their wishes. In other words, there is no evidence that Macky Bell unlawfully exercised dominion and control over the sale proceeds prior to 2016. As explained above, such actions may have occurred in late 2016, when Macky Bell removed her sons as powers of attorney and moved the account to a different Edward Jones branch, or in 2017, after she revoked the Transfer on Death Form, withdrew significant amounts from the account, and denied her sons an accounting. A cause of action for conversion therefore accrued in November 2016, at the earliest.

### ii. Breach of Fiduciary Duty (In the Context of a Joint Venture)

The Court also finds that a cause of action for breach of fiduciary duty in the context of a joint venture accrued no earlier than November 2016.  A cause of action for a breach of fiduciary

duty accrues when the breach occurs. *Rich & Rich Partnership v. Poetman Records USA, Inc.*, 714 F. Supp. 2d 657, 668 (E.D. Ky. 2010).

With respect to this claim, Defendant again argues that a breach of fiduciary duty occurred in 1998, when Macky Bell deposited the sale proceeds into the account titled solely in her name. [R. 50-1, pp. 9–13] For support, Defendant cites again to the Complaint's allegation that Mac and Rick Bell "had the right to possess their portion of the sale proceeds immediately at the time of sale of the underlying property and at any time thereafter" and that Defendant has "exercised dominion and control" over the proceeds for her own benefit since that time. *Id.* at 10 (citing R. 1-1, ¶¶ 17–19). "From that wrong," Defendant argues, "Plaintiffs derive the claimed existence of a joint enterprise and that [Macky Bell] has 'violated fiduciary duties owed to Plaintiffs.'" *Id.* (quoting R. 1-1, ¶¶ 26–27, 32).

Defendant again misconstrues the plaintiffs' arguments and overlooks the facts as developed in discovery. Plaintiffs argue that a joint venture was created in 1998, at the time the parties decided to jointly invest their shares of the sale proceeds. [R. 1-1, ¶¶ 27–31] For purposes of the statute of limitations argument, the Court assumes that a joint venture was created in 1998 as alleged. The parties do not dispute that the creation of such a joint venture creates a fiduciary relationship among the partners. *See, e.g.*, *Jones*, 179 S.W.2d at 196. Plaintiffs do not allege a breach of that specific fiduciary duty occurred until Macky Bell restricted their access to the account and denied them an accounting. [R. 1-1, ¶¶ 32–33] Nowhere in the Complaint (or the other filings) do the plaintiffs argue that a breach of fiduciary duty occurred in 1998.

Further, there is no evidence here that Macky Bell took any actions that might be considered adverse to her sons' interests in the sale proceeds, or that she otherwise breached a fiduciary duty to her sons, until 2016, at the earliest. From 1998 until approximately November

- 27 -

2016, Macky Bell continued to manage the Farm Account, removing only the interest and allowing the funds to grow considerably. There is no evidence that she ever acted contrary to her sons' wishes or against their interests, at least until 2016. At that time, she began making significant changes to the account, including removing her sons as powers of attorney and revoking the Transfer on Death Form identifying her sons as beneficiaries. Also, significantly, she began withdrawing large sums from the account in early 2017. Thus, a reasonable jury could conclude that in 2016/2017, Macky Bell gave her sons notice that she was holding their portion of the sale proceeds (to which they, as remaindermen, were entitled) against their interest. Stated another way, a reasonable jury could conclude that Macky Bell's actions in 2016/2017 breached a fiduciary duty owned to Mac and Rick Bell.  However, there is no evidence upon which a reasonable jury could conclude that a breach occurred *prior* to 2016.

### iii.  Breach of Fiduciary Duty (Resulting in Constructive Trust)

A constructive trust is an equitable remedy, not an independent cause of action. *Bewley*, 610 S.W.3d at 357–58. A court may impose a constructive trust to remedy certain misconduct, such as fraud, breach of fiduciary duty, or unjust enrichment. *Id.* at 358. The statute of limitations begins to run at the time the trust is created—or in other words, at the time of the fraud or inequitable conduct—so long as such facts were known to the interested persons at that time. *Patton v. Coldiron*, 281 S.W. 812, 813 (Ky. 1926); *see also* 55 A.L.R.2d 220 (1957).  In the present case, the plaintiffs allege that a constructive trust resulted from a breach of a fiduciary duty. *See infra* Section III(B)(3).

As to the constructive trust claim, Defendant points to the allegation in the Complaint that, "at the time of the sale of the property the full value of the remainder of the estate was vested in the Plaintiffs through the cash proceeds of the sale" and that "at the time of the vesting

of the proceeds . . . a constructive trust was created." *Id.* at 12–13 (quoting R. 1-1, ¶¶ 38, 40). Defendant argues that, assuming a joint venture existed, Macky Bell breached her fiduciary duties in 1998, and that breach, in turn, triggered a constructive trust.

With respect to the constructive trust claim, the Complaint does allege that "at the time of the vesting of the proceeds and the joint investment of them between [Macky Bell] and Plaintiffs a constructive trust was created which imposed upon the parties fiduciary duties to each other." *Id.* ¶ 40. This seems to be a simple misuse of the term "constructive trust." As noted above, a constructive trust is an equitable remedy imposed by a court upon the finding of some wrongdoing; it is not something the parties can create by agreement or otherwise. It therefore appears that Plaintiffs intended to allege that a *relationship of trust* was created in 1998 upon the joint investment of the funds, thereby triggering certain fiduciary duties.

This theory is supported by the law and the evidence of record, as discussed in detail below, *see infra* Section III(B)(3). When the parties held their respective interests in the Family Farm, Macky Bell, as the life estate holder, owed a fiduciary obligation to Mac and Rick, the remaindermen. *See supra* Section 3(A)(II). Specifically, she owed a duty to protect and not injure their remainder interests. Even if the life estate and remainder interests terminated in 1998, the origin of the parties' interests—and the fiduciary nature of their relationship—cannot be ignored. The sale proceeds derived from the sale of the Family Farm; they are the proceeds of the parties' life estate and remainder interests in that property. There is no dispute of that fact. Upon the sale of the Family Farm, Macky Bell was entitled to her share of the proceeds as the former life estate holder, and Mac and Rick Bell were entitled to their shares as the former remaindermen. *See, e.g.*, 31 C.J.S. Estates § 64. Mac and Rick Bell did not abandon their right to a fair share of the proceeds simply by acquiescing to their mother's possession of the funds, *see*

- 29 -

*Holman*, 77 P.2d at 520, and there is no evidence that they gifted their shares to their mother. Rather, she possessed the funds with a duty to distribute them to Mac and Rick and, until such distribution was made, to protect the funds. *See generally Hammons*, 327 S.W.3d at 451–52; (discussing duties of life estate holder); 31 C.J.S. Estates § 40 (same). To summarize, even if the life estate and remainder interests terminated in 1998, a fiduciary relationship continued in the former life estate holder and the former remaindermen—and Macky Bell therefore owed a duty to protect her sons' shares of the proceeds, at least until a distribution was made and/or requested. *See generally*, *Holman*, 77 P.2d at 520.

This analysis is supported by the facts. For example, Plaintiffs argue that the Farm Account "adopted the name, purpose, and plan created in the wills [for the disposition of the proceeds]." [R. 84, p. 3] This is evidenced by the fact that an account was formally labeled as "[under the wills] of Kathryn M. Staton & Richard M. McMurtry." That name reflects the origin and nature of the account funds. The funds were the proceeds from the life estate and remainder interests in the Family Farm, which existed under the wills of Kathryn M. Staton and Richard M. McMurtry. Though the life estate and remainder interests might have been terminated by the sale of the Family Farm, clearly each party was entitled to their respective share of the proceeds. *See, e.g.*, 31 C.J.S. Estates § 64. Thus, Macky Bell's retention of the entire proceeds (which were deposited immediately into the Edward Jones account) triggered a certain fiduciary relationship—one in which Mac and Rick Bell, as the former remaindermen, were entitled to a distribution of their shares and Macky Bell, as the possessor of those shares, was under a fiduciary duty to protect those shares until a distribution could be made or was requested.

Plaintiffs very clearly allege that this duty was breached when Macky Bell "refus[ed] to provide and prevent[ed] the creation of an accounting" of the Farm Account and by "refusing to

make available to Plaintiffs those assets to which they are entitled to receive." *Id.* ¶¶ 44–45. This breach, in turn, would have triggered the constructive trust. Plaintiffs do not allege that any breach of a fiduciary duty occurred in 1998 or any earlier than 2016.

Further, as noted above, there is no evidence here that Macky Bell took any actions that might be considered adverse to her sons' interests in the sale proceeds, or that she otherwise breached a fiduciary duty to her sons, until 2016, at the earliest. It was not until 2016 that she began making significant changes to the account, including removing her sons as powers of attorney and revoking the Transfer on Death Form. And it was not until 2017 that she began withdrawing large sums from the account. From these actions, a reasonable jury could conclude that in 2016/2017, Macky Bell gave her sons clear notice that she was holding their portion of the sale proceeds (to which they, as remaindermen, were entitled) against their interest. Stated another way, a reasonable jury could conclude that Macky Bell's actions in 2016/2017 breached a fiduciary duty owned to Mac and Rick Bell, and that a constructive trust was therefore triggered. There is scant evidence upon which a reasonable jury could conclude that any such breach or repudiation occurred *prior* to 2016.

Accordingly, even under the theory that the life estate arrangement was terminated in 1998, Mac and Rick Bell's causes of action would have accrued no earlier than November 2016. This suit, brought less than a year later, is timely. The Court will therefore deny Defendant's first Motion for Summary Judgment, [R. 50].

### B.  SECOND MOTION FOR SUMMARY JUDGMENT, [R. 61]

Defendant filed her Second Motion for Summary Judgment after the close of discovery. In this motion, Defendant argues that (1) Plaintiffs' conversion claim must fail because they consented to Macky's possession and enjoyment of the sale proceeds and abandoned the

proceeds; (2) the breach of fiduciary duty (joint venture) claim must fail because the only evidence in support of that claim is Plaintiffs' own self-serving testimony, and further, a joint venture agreement must satisfy the Statute of Frauds; and (3) a claim for a constructive trust must fail because it is an equitable remedy, but there is nothing to remedy if Counts I and II fail.

### 1.  Count 1 – Conversion

The intentional tort of conversion "is generally defined as 'the wrongful exercise of dominion and control over the property of another.'" *Jasper v. Blair*, 492 S.W.3d 579, 582 (Ky. App. 2016) (quoting *Jones v. Marquis Terminal, Inc.*, 454 S.W.3d 849, 853 (Ky. App. 2014)). The elements of a conversion claim are: (1) the plaintiff held legal title to the property; (2) the plaintiff possessed or had the right to possess the property at the time of its conversion; (3) the defendant "exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment"; (4) the defendant intentionally interfered with the plaintiff's possession; (5) the defendant refused the plaintiff's demand for the return of the property; (6) the defendant legally caused the plaintiff's loss of the property; and (7) the plaintiff suffered damage as a result of the loss of the property. *Id.* (citing *Jones*, 454 S.W.3d at 853).

Defendant argues that Plaintiffs have admitted that they consented to Macky Bell's possession and enjoyment of the sale proceeds. [R. 61, pp. 10–11] In other words, Defendant argues that Mac and Rick Bell voluntarily relinquished their rights in the sale proceeds. *Id.* As a result, Defendant argues, Mac and Rick Bell are unable to satisfy elements 3, 4, and 5 of a conversion claim. *Id.* Defendant also argues that Plaintiffs are prohibited from relying on any hearsay evidence to support their conversion claim.

Defendant's argument overlooks the possibility that Macky Bell could have exceeded the scope of Mac and Rick Bell's consent. As explained in more detail above, there exists a genuine dispute of material fact as to whether the life estate continued in the sale proceeds (in which case Mac and Rick Bell held only a remainder interest in the funds) or whether the life estate arrangement was terminated in 1998 (at which point the parties took a fee simple title to their share of the funds). In the latter case, Mac and Rick Bell would have held a fee simple title to their share of the sale proceeds in 1998 and could arrange for their mother to hold and invest the funds, to their ultimate benefit (regardless of whether a formal joint venture was created). There is no evidence that they intended to abandon the funds by doing so. *See Holman*, 77 P.2d at 520. While Macky Bell continued to possess, invest, and use the funds with Mac and Rick Bell's consent, no conversion occurred by Macky Bell's doing so. However, a reasonable jury could review the evidence of record and conclude that Macky Bell exceeded her authority to possess and use the funds in 2016 or 2017, when she made unilateral changes to the Farm Account, denied her sons' access to the account, and denied them an accounting.

Further, a jury could reach this conclusion without reliance on inadmissible hearsay. Defendant argues that Mac and Rick Bell cannot rely on any hearsay testimony as to what Macky Bell said about the Farm Account. To a certain extent, this is true. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) ("[H]earsay evidence cannot be considered on a motion for summary judgment." (citation omitted)). However, hearsay is defined as an out-of-court statement offered *for the truth of the matter asserted*. *See* Fed. R. Evid. 801(c). When an out-of-court statement is offered for some other purpose—such as its effect on the listener—it is not hearsay. *See Moore v. City of Memphis*, 853 F.3d 866, 871 (6th Cir. 2017) (citation omitted). Thus, in theory, Mac and Rick Bell could testify as to statements made by Macky Bell if offered

to show that such statements caused them to believe that the life estate arrangement was terminated. Further, Defendant's hearsay argument is undeveloped. Defendant does not point to any specific testimony or statements in the record that she claims constitute inadmissible hearsay. The Court will not scour the record to determine if any such statements exist; rather, it is sufficient at this stage of the proceedings to note that Mac and Rick Bell could support their conversion claim without reliance on inadmissible hearsay statements.

Thus, a reasonable jury could review the *admissible* evidence of record and conclude that (1) the life estate arrangement terminated in 1998; (2) Mac and Rick Bell understood that Macky Bell would hold and invest the funds on their behalf; and (3) she exceeded her authority to do so and converted her sons' shares of the sale proceeds in 2016 and/or 2017. Summary judgment is therefore in appropriate with respect to Plaintiffs' conversion claim (Count I).

### 2. Count II – Breach of Fiduciary Duty (Joint Venture)

A joint venture (sometimes referred to as a joint enterprise) "is 'an informal association of two or more persons, partaking of the nature of a partnership, usually, but not always, limited to a single transaction in which the participants combine their money, efforts, skill, and knowledge for gain, with each sharing in the expenses and profits or losses.'" *Roethke v. Sanger*, 68 S.W.3d 352, 364 (Ky. 2001) (quoting *Eubank v. Richardson*, 353 S.W.2d 367, 369 (Ky. 1962)). A joint venture requires

> (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

*Id.* (quoting *Huff v. Rosenberg*, 496 S.W.2d 352, 355 (Ky. 1973)) (internal quotation marks omitted).

A joint venture creates a fiduciary relationship among the parties. *See Jones v. Nickell*, 179 S.W.2d 195, 196 (Ky. 1994); *Lappas v. Barker*, 375 S.W.2d 248, 251 (Ky. App. 1963). Accordingly, partners in a joint venture must act with "good faith or honesty, loyalty or obedience, as well as candor, due care, and fair dealing." *Lach v. Man O'War, LLC*, 256 S.W.3d 563 (Ky. 2008) (quoting *Anthony v. Padmar, Inc.*, 465 S.E.2d 745, 752 (S.C. App. 1995)) (internal quotation marks omitted).

As to Count II, Defesndant argues that Mac and Rick Bell are prohibited from relying on hearsay statements to support their claim of a joint venture, and further, a joint venture of this nature must satisfy the Statute of Frauds. [R. 61, pp. 20–24] The Court need not reach the hearsay and Statute of Frauds questions,[10] however, because there is no evidence of record to support the fourth element of a joint venture: "an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Roethke*, 68 S.W.3d at 364 (quoting *Huff*, 496 S.W.2d at 355) (internal quotation marks omitted). Mac, Rick, and Macky Bell may have agreed to jointly invest their funds for a common purpose; however, the evidence indicates that the funds were invested solely in Macky Bell's name and she alone had the power to control the Farm Account during significant periods of time. Further, there is no evidence that Mac and Rick Bell participated in the management of the Farm Account in any significant way or had an "equal

---

[10] While the Court will not address the Statute of Fraud argument in great detail, it notes Defendant's statement that "partnership agreements (including joint ventures) are generally in writing, [but] under Kentucky law they are not required to be." [R. 54, p. 8] Defendant then cites to Kentucky's requirement that a *contract* be in writing if it cannot be performed within a year, but goes on to acknowledge that Kentucky has never decided whether an alleged oral agreement to form a joint venture falls within the Statute of Frauds. Defendant therefore asks the Court to follow Ohio law on this issue, something this Court would be hesitant to do in light of Kentucky case law suggesting that "partnership agreements are generally not within the statute of frauds." *Dutton v. Dutton*, No. 2012-CA-001403-MR, 2014 WL 631572, *4 (Ky. Ct. App. Feb. 14, 2014) (citing *Stewart v. Stovall*, 230 S.W. 929, 932 (1921)). Because joint ventures are a type of partnership and "governed by principals of partnership law," *Abbott v. Chesley*, 413 S.W.3d 589, 604 (Ky. 2013), it would make sense that joint ventures in Kentucky need not satisfy the Statute of Frauds.

right to a voice in the enterprise" or an "equal right of control." This is an essential element of a joint venture.

Because a reasonable jury could not review the evidence of record and conclude that Mac and Rick Bell had an equal right of control of the Farm Account, it is appropriate to grant summary judgment with respect to this breach of fiduciary duty claim (Count II).

### 3.  Count III – Breach of Fiduciary Duty (Constructive Trust)

A constructive trust is not a cause of action; it is an equitable remedy imposed by a court "in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it." *Bewley v. Heady*, 610 S.W.3d 352, 357–58 (Ky. App. 2020). Such "constructive trusts may be imposed as a remedy associated with claims of fraud, breach of confidence, breach of fiduciary duty, or unjust enrichment." *Id.* at 358.

Defendant argues that Plaintiff's Count III does not list a separate cause of action, but rather is an equitable remedy contingent on the success of their claims for conversion and breach of fiduciary duty (joint venture).  The Court disagrees with this characterization of Count III.

Plaintiffs' Count III lists a cause of action for "Breach of Fiduciary Duty – Constructive Trust." [R. 1-1, p. 5] They allege that a constructive trust was created at the time Macky Bell possessed and invested the funds in the Edward Jones Account in 1998. *Id.* They then allege that Macky Bell breached her fiduciary duty by refusing to provide an accounting and by restricting their access to the account. *Id.* at 6. As noted above, a constructive trust is an equitable remedy, imposed by a court upon a finding of some wrongdoing or inequitable conduct (such as a breach of fiduciary duty). Because a constructive trust is not something the parties create, the Court understands Count III to be a request for a constructive trust, which allegedly resulted from a

breach of fiduciary duty—but not necessarily a breach of fiduciary duty in connection with a joint venture.

Though this claim, as pleaded in the Complaint, rests on the theory that the life estate arrangement was terminated in 1998, the Court has already found that a reasonable jury could conclude that the life estate was terminated *or* that it continued in the sale proceeds. Under the latter theory, a quasi-fiduciary relationship existed between Macky Bell, the life estate holder, and her sons, the remaindermen. *See, e.g.*, *Hammons*, 327 S.W.3d at 451–52 (citations omitted). As a fiduciary, Macky Bell owed her sons a duty not to harm their interests or injure the corpus of the estate to their detriment. *Id.* (citations omitted).  A reasonable jury could conclude that Macky Bell breached that fiduciary duty in 2016 and/or 2017 when she made certain changes to the account and later withdrew significant funds from the account. Further, a jury could reach this conclusion without reliance on any inadmissible hearsay.

Furthermore, a reasonable jury could find that the life estate terminated in 1998, at which point the fiduciary nature of the parties' relationship remained intact, as noted above. On this point, the Court again emphasizes the origin and nature of the parties' original interests in the Family Farm. There is no dispute that, under the wills of Kathryn Staton and Richard McMurtry, Macky Bell held a life estate in the Family Farm, and Mac and Rick Bell held remainder interests in the farm. Thus, prior to the sale of the farm, Macky Bell owed a fiduciary obligation to Mac and Rick to protect and not injure their remainder interests. *See supra* Section 3(A)(II).

The nature of this fiduciary relationship was discussed in *Wheeler v. Kazee*, 253 S.W.2d 378 (Ky. 1952). In that case, a mother held a life estate in certain realty, subject to her son's remainder interests. The property was foreclosed upon, and the mother purchased the property at a foreclosure sale. In her will, the mother attempted to devise the property to each of her four

children equally. The Supreme Court of Kentucky held that the mother had purchased the

property subject to her life estate and her son's remainder interests; she had *not* terminated those

interests by purchasing the property. *Id.* at 380. The Court further noted that,

> [e]ven had she so intended [to destroy her son's remainder interest], the law would
> not have permitted her to so destroy it. It has been held that the relationship between
> a life tenant and a remainderman is of a fiduciary nature, and that the purchase by
> a life tenant at a foreclosure sale is for the protection of both interests.

*Id.* (citations omitted). In other words, the life tenant was presumed to be acting in the interests

of the remainderman, absent some "unequivocal notif[ication]" to the son "that she was claiming

a fee simple title to the property in derogation of his remainder interest." *Id.* In that respect,

"[h]er possession was wholly consistent with her life interest and his remainder interest." *Id.* The

court explained,

> As a general rule, the possession of a life tenant . . . is not adverse to the
> remainderman . . . The life tenant . . . is not presumed or deemed to hold adversely
> to the remainderman before the death of the life tenant; on the contrary, the
> presumption is that the possession of . . . one holding under or through him is not
> adverse.

*Id.* (quoting 31 C.J.S. Estates § 66).  "In any event, the possession of one holding a life estate

does not become adverse to the holder of the future estate unless the life estate is renounced, and

notice is clearly conveyed to the remaindermen that their property is being held or claimed

adversely and not under the life tenancy." *Id.* (quoting C.J.S. Estates § 66); *see also Salyers*

*Guardian v. Keeton*, 283 S.W. 1015 (Ky. 1926).

Just as the mother in *Wheeler* could not acquire adverse title through the foreclosure sale

without first unequivocally notifying her son that she was holding the property in derogation of

his remainder interest, Macky Bell could not possibly acquire paramount title to her sons' share

of the sale proceeds simply by holding the proceeds with the consent of her sons, even assuming

she secretly intended to acquire paramount title over the years. This is especially true where, in

this case, she not only failed to provide unequivocal notice she was holding against their interest, her actions were wholly consistent with her honoring their remainder interest (e.g., segregating the Farm Account, not depleting the corpus, making her sons payable-on-death beneficiaries).

This analysis applies even if the life estate terminated in 1998. Assuming the life estate terminated in 1998 upon the sale of the farm, each party was entitled to their share of the proceeds. Accordingly, when the full amount of the sale proceeds was turned over to Macky Bell rather than distributed to each party individually, Mac and Rick Bell retained their right to receive a distribution of the funds. 31 C.J.S. Estates § 64. Macky Bell therefore possessed the funds with a duty to distribute them to Mac and Rick and, until such distribution was made, to protect the funds. *See generally Hammons*, 327 S.W.3d at 451–52; (discussing duties of life estate holder); 31 C.J.S. Estates § 40 (same). Thus, even if the life estate and remainder interests terminated in 1998, a fiduciary relationship continued in the former life estate holder and the former remaindermen—and Macky Bell therefore owed a duty to protect her sons' shares of the proceeds, at least until a distribution was made and/or requested. As noted above, this analysis is supported by the facts. The Farm Account was formally labeled as "[under the wills] of Kathryn M. Staton & Richard M. McMurtry," thereby reflecting the origin and nature of the account funds, including the continuing fiduciary relationship of the parties.

Under that continuing fiduciary obligation, Macky Bell could not obtain paramount title in the proceeds simply by possessing them. Instead, she must provide unequivocal notice to her sons that she intended to claim superior title or hold the proceeds against their interest. *See, e.g.*, *Wheeler*, 253 S.W.2d at 380. Such a claim against her sons' interest would breach her ongoing fiduciary obligation to protect their interests. Based on the evidence of record, a reasonable jury could conclude that Macky Bell breached that fiduciary duty in 2016 and/or 2017 when she took

- 39 -

certain actions that allegedly harmed her sons' interests, including making certain changes to the account and later withdrawing significant funds from the account. Further, a jury could reach this conclusion without reliance on any inadmissible hearsay.

In sum, the Court finds that there is a genuine dispute of material fact as to whether Macky Bell wrongfully exercised dominion and control over the Family Farm sale proceeds and whether she breached a fiduciary duty owed to her sons. The Court will therefore deny summary judgment with respect to Counts I and III. However, the Court finds that there is no genuine dispute of material fact with respect to an essential element of Plaintiffs' joint venture claim, and it will therefore grant summary judgment with respect to Count II.

## IV. CONCLUSION

For the reasons set forth above, the Court will deny Defendant's Motion for Summary Judgment, [R. 50], and deny in part and grant in part Defendant's Second Motion for Summary Judgment, [R. 61]. Accordingly, the Court being sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Defendant's Motion for Summary Judgment, [**R. 50**], is **DENIED**.

2. Defendant's Second Motion for Summary Judgment, [**R. 61**], is **GRANTED IN PART** and **DENIED IN PART**.

   a. Said Motion is **GRANTED** with respect to Count II (breach of fiduciary duty – joint venture).

   b. Said Motion is **DENIED** with respect to Count I (conversion) and Count III (breach of fiduciary duty – constructive trust).

This the 31 day of March, 2021.

Claria Horn Boom

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY